U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 AUG 17 AM 8:32

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| TRUST F/B/O DIANNE ROSE U/A DTD 9/12/02, | ) ) ) |
| Appellant, | ) ) ) |
| v. | ) Case Nos. 2:23-cv-4 |
| | ) 2:23-cv-5 |
| PAUL A. LEVINE, *Chapter 7 Trustee*, STONE WOLF CAPITAL MANAGEMENT CO. and PEKIN BROOK FARM, LLC, *Debtors*, | ) ) ) ) |
| Appellees. | ) ) |

**DECISION ON APPEAL**
**(Doc. 1 in No. 2:23-cv-4 and in No. 2:23-cv-5)**

In this pair of bankruptcy appeals, appellant Trust f/b/o Dianne Rose u/a dtd 9/12/02 (the "Rose Trust") seeks reversal of the Bankruptcy Court's Order dated December 20, 2022, disallowing the Rose Trust's claims against debtors Stone Wolf Capital Management Co. and Pekin Brook Farm, LLC. (Doc. 2-38). The Rose Trust asserts that it made numerous disbursements to Dianne Rose's son Paul Rose and to Virginia Kern, GP Land Management, LLC, and Pekin Brook Farm, LLC ("Pekin Brook") to fund construction and development of an organic farm in East Calais, Vermont. The Rose Trust further asserts that Pekin Brook promised to repay those disbursements, as evidenced by a $752,500 promissory note. On appeal, the Rose Trust argues that the Bankruptcy Court should have found that the promissory note is an enforceable negotiable instrument under Delaware's version of the Uniform Commercial Code and that the Rose Trust is entitled to enforce the note.

The court heard oral argument on the appeals on July 19, 2023. For the reasons that follow, the court reverses the decision of the Bankruptcy Court disallowing the claim arising

from the Pekin Brook promissory note on the ground of lack of consideration. The note was supported by consideration in the form of antecedent debt, including credit extended to third parties as well as directly to Pekin Brook. Under the Delaware provisions of the UCC, these prior advances are sufficient consideration to support a subsequent note. The court also concludes that the matter should be remanded to allow consideration of the trustee's separate claim for recharacterization of the debt evidenced by the Pekin Brook note.

### Scope of Review

This court has jurisdiction under 28 U.S.C. § 158(a). Section 158 "requires district courts to operate as appellate courts." *In re Anderson*, 884 F.3d 382, 387 (2d Cir. 2018). Accordingly, the district court "may modify, affirm, reverse, or remand" the Bankruptcy Court's order. *In re Corporate Res. Servs., Inc.*, 595 B.R. 434, 441 (S.D.N.Y. 2019); *see also, e.g., GMAC Mortg., LLC v. Orcutt*, 506 B.R. 52, 59 (D. Vt. 2014). In bankruptcy appeals, the district court reviews the bankruptcy court's findings of fact for "clear error" and reviews the bankruptcy court's legal determinations "de novo." *Anderson*, 884 F.3d at 387.

### Facts[1]

The court draws the facts primarily from the Bankruptcy Court's findings of fact (A0005–A0007), with citations to the record on appeal as appropriate.[2] Except as otherwise

---

[1] The appeal docketed No. 2:23-cv-4 is an appeal of the bankruptcy case for Stone Wolf Capital Management Co. docketed No. 20-10208; the appeal docketed No. 2:23-cv-5 is an appeal of the bankruptcy case for Pekin Brook Farm, LLC docketed No. 20-10207. Because the Rose Trust's appeal is focused on the portions of the Bankruptcy Court's Order concerning Pekin Brook Farm, LLC, it is unnecessary to cite materials from the appeal docketed No. 2:23-cv-4 or the bankruptcy case docketed No. 20-10208. The court cites materials in the appeal docketed No. 2:23-cv-5 by (Doc. #) and materials in the bankruptcy case docketed No. 20-10207 by (Bankr. Doc. #). The court adopts the parties' citation convention and cites the Rose Trust's appendix, Doc. 3-1, as "A___", and cites the Trustee's appendix, Doc. 5-1, as "T___".

[2] The Rose Trust faults the Bankruptcy Court for failing to "tie its findings of fact by citation to any evidence or pleadings in the record or on the docket." (Doc. 3 at 20.)

2

noted, the Rose Trust does not challenge any of the Bankruptcy Court's factual findings. While the factual background of this case is extensive, the court recites only those facts necessary to resolve these appeals.

In 2012, Paul Rose purchased undeveloped, unimproved forested property at 480 Pekin Brook Road in East Calais, Vermont. (*See* A0529, A0533–0535.) The property was deeded in the name of his then-girlfriend, Virginia Kern. (*See* A0107 (referencing deed "recorded July 10, 2012 in Vol. 40, Page 630 of the Town of Calais Land Records"); A0535.) Paul and Virginia[3] intended to establish a farming operation at the property. (*See* A0536.)

Paul and Virginia were not able to obtain conventional financing for establishment of the farm. According to the testimony of Paul's mother, Dianne Rose, Paul asked her to loan him the funds. (Bankr. Doc. 134 at 105.) Dianne Rose testified that she is a beneficiary and a trustee of the Rose Trust.(A0563.) She testified that, in response to Paul's request, she "borrowed money against my trust, collateralized it, and I sent him money when he needed it for various things." (Bankr. Doc. 134 at 105.)

---

The Trustee maintains that the Bankruptcy Court stated the bases for its decision "in a manner more than sufficient to allow appellate review and that is all that Rule 52 requires." (Doc. 5 at 23 n.4.) The court agrees with the Bankruptcy Court that Fed. R. Civ. P. 52 applies in bankruptcy proceedings (*see* A0005 n.1) and agrees with the Chapter 7 Trustee that Rule 52 does not require the bankruptcy court to include record citations in its findings of fact. *See Lay v. United States*, No. 21-60776, 2022 WL 1613004, at *1 (5th Cir. 2022) (per curiam) (recognizing that Rule 52(a) contains no requirement to include record citations in findings of fact); *cf. U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 399 (S.D.N.Y. 2016) (district court's citations to the record were "for exemplary purposes and not intended to be an exhaustive listing of all record support for a statement"). The court had no difficulty understanding the basis in the record for the findings reached by the Bankruptcy Court. With few exceptions, the parties agree about the facts giving rise to this dispute.

[3]  The court adopts the parties' conventions referring to Paul Rose as "Paul" and Virginia Kern as "Virginia." No disrespect is intended.

3

Disbursements from the Rose Trust over the course of several years between 2012 and 2015 financed the clearing of the land and construction and development at the 480 Pekin Brook Road property. According to a disbursement schedule prepared by Dianne Rose, she approved the transfer of a total of $752,500 via more than 40 transactions between February 2013 and November 2015. (A0221.) The disbursement schedule lists Virginia Kern or Paul Rose as the recipients of those transfers until mid-September 2014 (totaling $327,500).[4] (*Id.*) Dianne Rose testified that, in her view, the Rose Trust was "lending" money to "the farm" and that "when they started having revenues, [they] would pay it back." (A0566; *see also* A0564.)

In addition to the financial assistance from the Rose Trust, Paul's father, Herbert Rose, assisted with "hands-on" teaching and with the "business aspect" of the farm. (A0534–0535.) Herbert Rose and Dianne Rose divorced in the 1980s. (*See* A0562.) Herbert Rose testified that he regarded the disbursements from the Rose Trust as a loan to Paul. (A0536.)

In early 2014, Paul and Virginia formed GP Land Management, LLC ("GPLM") to manage and maintain the Pekin Brook Road property. GPLM's operating agreement identified Virginia Kern and Herbert Rose as the LLC's two members and as co-managers. (Doc. 2-73 at 338, 340.) In August 2014, Virginia conveyed the 480 Pekin Brook Road property to GPLM by quitclaim deed. (*See* Bankr. Doc. 96-12 at 16.) Dianne Rose's disbursement schedule shows that, between September 2014 and June 2015, transfers from the Rose Trust went to GPLM. (A0221.) The final transfer to GPLM was for $40,000 on June 5, 2015; the total transferred to GPLM was $272,000. (*Id.*)

---

[4] One additional transfer of $3,000 to Paul was made on November 4, 2014.

4

In 2015, Virginia severed her personal and business ties with Paul and with the farm. (*See* A0538–0539; A0577; T068–069.) The breakup was sudden. (A0539; A0577.) No evidence indicates that Virginia took any action to assign her membership interest in GPLM.

In his capacity as managing member of GPLM, Herbert Rose signed a Promissory Note dated June 5, 2015 (the "GP Note") memorializing the LLC's promise to pay the Rose Trust the principal amount of $602,500, with interest at 2.75% per year, compounded annually. (A0210–0215.) The GP Note specified that, absent an uncured or waived event of default, the principal and interest would be due on June 30, 2017. (A0211.) The $602,500 figure represented the sum of transfers from the Rose Trust to Virginia, Paul, and to GPLM through June 5, 2015, as those transfers appeared on a schedule attached to the GP Note. (A0215.)[5] The GP Note included a choice-of-law provision stating that Delaware law would govern. (A0214.) The GP Note was not secured by a mortgage on the 480 Pekin Brook Road property. (*See* T066.) No payments were ever made on the GP Note.

On July 14, 2015, Herbert Rose formed Pekin Brook Farm, LLC ("Pekin Brook") as a new entity to manage and maintain the 480 Pekin Brook Road property. (Bankr. Doc. 96-27 (articles of organization).) Herbert Rose testified that doing business as a "land management" company was confusing or difficult for customers buying farm produce and that it was important to have the word "farm" in the name. (A0543.) He also testified that, instead of changing the name of GPLM, he formed Pekin Brook Farm as a new entity because Paul and Virginia had split up and "Paul wanted to get those assets away from Ginny." (T068–69.) No agreement evidences any assignment of GPLM's indebtedness to Paul, Virginia, or to Pekin Brook.

---

[5] The lines for the 2012 transactions are not visible on the schedule attached to the GP Note as it appears at A0215. The 2012 transactions appear elsewhere in the record. (*See, e.g.*, Doc. 2-31 at 54; A0066; A0236.)

5

On September 30, 2015, Herbert Rose signed a "certificate of resolution" for GPLM. He testified that the purpose of that document was to remove Virginia Kern from GPLM. (A0538.) The certificate of resolution also authorized the transfer of GPLM's assets to Pekin Brook. (*See* A0006; A0540.) The resolution is silent regarding any liability to the Rose Trust or otherwise. (*See* A0006.) Herbert Rose also caused GPLM to convey the 480 Pekin Brook Road property to Pekin Brook by quitclaim deed dated September 30, 2015. (*See* A0039 (referencing Vol. 47, Page 117 of the Town of Calais Land Records).) According to Herbert Rose, GPLM was, at that point, "dissolved." (A0544.)[6]

In a letter dated July 15, 2017 and signed on behalf of the Rose Trust by Dianne Rose, the Rose Trust advised Herbert Rose, as the managing member of GPLM, that the GP Note was "due and payable in full with accrued interest as of June 30, 2017." (A0459.) The letter further stated:

> Please remit payment of the principal balance of $602,500, plus accrued interest to date. I have previously contacted you about the impending payment and have not received any confirmation or an estimated payment date. So please confirm receipt of this letter and let me know when the LLC will make payment.

(*Id.*) Herbert Rose responded in a letter that he signed as managing member of GPLM dated December 15, 2017:

> I [am] writing to inform you that I have received your multiple requests for repayment of the Promissory Note from [GPLM] to the Trust FBO Dianne Rose u/a dtd 9/12/02. Unfortunately, repayment will not be forthcoming as the business venture failed to generate any cash flow and [GPLM] was dissolved. Since the Promissory Note was only executed by [GPLM] without any guaranties, you have no recourse for payment and the Promissory Note is essentially worthless.

---

[6] The Rose Trust's statement of facts in the Bankruptcy Court indicates that GP Land Management, LLC was dissolved effective January 29, 2016. (A0039.) The precise date of dissolution is not material to the resolution of the appeals.

6

(A0461.) Dianne Rose testified that attorney Ronald Pohl prepared both the July 2017 letter and the December 2017 response. (T054.)

Although the timing is not exactly clear, Paul met Cella Bernier in or about 2017. (*See* T163; Bankr. Doc. 135 at 108.) According to her testimony, she and Paul began dating, and she became involved in the farm and supported Paul's plan to start a farm-to-table restaurant. (Bankr. Doc. 135 at 109.) Sometime after meeting Cella Bernier—also in or about 2017—Paul was diagnosed with cancer. (A0547; Bankr. Doc. 135 at 109.) He and Cella Bernier married after his cancer diagnosis; she took his last name. (*See* Bankr. Doc. 135 at 109.) After sustaining a work injury, Cella Rose convinced Paul to drop the restaurant project. (*Id.*) In 2018—after finding that cannabidiol (CBD) relieved many of the symptoms from chemotherapy and radiation cancer treatment—Paul decided to convert the farm into a CBD-growing operation. (A0548; *see also* Bankr. Doc. 135 at 110.)

Herbert Rose's wife passed away on April 14, 2018 after a 2014 lung cancer diagnosis and treatment and then complications in 2018 from influenza and pneumonia. (A0546.) He testified that he was not interested in being involved with the new CBD business. (A0548.) He took several actions as he reduced his connections to the farm.

First, on behalf of Pekin Brook, Herbert Rose signed a "Promissory Note" dated July 1, 2018 (the "PB Note") memorializing Pekin Brook's promise to pay the Rose Trust the principal amount of $752,500, with interest at 2.87% per year, compounded annually. (A0217–A0221.)[7]

---

[7] The Bankruptcy Court found that there was "no independent notarization or indication as to when the [PB Note] was executed" (A0007) and stated that it "questions the date of the [PB Note]" (A0010 n.4.) The PB Note as it appears in the record is not notarized. (*See* A0217–A0221.) Herbert Rose testified that he executed the PB Note before "turning over the farm to Paul." (A0549.) On cross-examination, Herbert Rose testified that Paul asked him to sign the PB Note at a time that Paul was trying to raise money. (Bankr. Doc. 133 at 186.) The Chapter 7 Trustee inquired whether that was sometime in 2019, and Herbert Rose testified that

7

In particular, the PB Note states: "PEKIN BOOK FARM, LLC (the "Issuer"), for value received in accordance with the schedule of payments annexed hereto, hereby promises to pay to the order of the TRUST FBO DIANNE ROSE U/A DTD 9/12/02 (the "Holder") the principal amount of $752,500." (A0217.) The PB Note specified that, absent an uncured or waived event of default, the principal and interest would be due on June 30, 2023. (*Id.*)

The $752,500 figure represented the sum of transfers from the Rose Trust to Virginia, Paul, GPLM, and Pekin Brook (including all of the transfers that were at issue in the GP Note) through November 9, 2016. All of these transfers appeared on a schedule attached to the PB Note. (A0221.)[8] Like the GP Note, the PB Note included a choice-of-law provision stating that Delaware law would govern. (A0220.) The PB Note was not secured by a mortgage on the 480 Pekin Brook Road property. Herbert Rose testified that he signed the PB Note because he believed Pekin Brook owed the money to the Rose Trust and that the indebtedness needed to be documented. (A0549.)

Second, Herbert Rose signed a "Membership Interest Transfer Power" document dated July 6, 2018.[9] (Doc. 2-73 at 212.) That document stated that Herbert Rose assigned and transferred "all the outstanding membership interests (the 'Membership Interest') in Pekin Brook

---

he did not know. (*Id.*) The court accepts that Herbert Rose's statements about the date he signed the PB Note might not be "independent" evidence of that date. However, as counsel for the Rose Trust noted at the July 19, 2023 hearing on appeal, attorney Ronald Pohl's affidavit indicates that he drafted the PB Note and that Attorney Pohl received a copy of the PB Note with Herbert Rose's signature "shortly after" sending it to him on or about July 1, 2018. (Doc. 2-30.)

[8] The lines for the 2012 transactions are not visible on the schedule attached to the PB Note as it appears at A0221. The 2012 transactions appear elsewhere in the record. (*See, e.g.*, Doc. 2-31 at 54; A0066; A0236.)

[9] The Bankruptcy Court found that Herbert Rose signed the document in March 2019. (A0007.) Attorney Richard W. Moulton, III testified that Herbert Rose signed the document in 2019 and that it was backdated. (Bankr. Doc. 133 at 103–04.)

8

Farm, LLC . . . to Paul Rose." (*Id.*) The document also included Herbert Rose's representations that the Membership Interest was "freely transferable and unencumbered" and that "no other person or entity has any interest in the Company." (*Id.*)

On August 8, 2018, Paul Rose formed Stone Wolf Capital Management Company ("Stone Wolf"). (A0480; *see also* Doc. 2-73 at 145.) According to a business plan and proposal, Stone Wolf was to "serve as the parent company for several wholly owned subsidiary Limited Liability Corporations (LLCs) operating in specific areas of the hemp and future cannabis industries." (Doc. 2-73 at 35.) The business plan stated that the operation was seeking to raise $2 million in start-up capital. (*Id.* at 27.) The business plan further stated that "Paul has invested substantial personal resources into this venture including approximately $100,000 toward the Essex facility [an extraction laboratory] and other associated expenses and approximately $1.4M into the development of Pekin Brook Farm." (*Id.* at 32.) The business plan did not mention any indebtedness to the Rose Trust.

In 2018, Paul Rose retained attorney Richard W. Moulton, III to help with business formation tasks. (T073.) Attorney Moulton's work included helping Paul to "engage in a private placement to sell securities to investors to raise capital for his business." (T074.) Attorney Moulton testified that Paul identified a group of investors from Florida who were interested in financing the business: Greg Eversole, Herbert Deuschel, and Sacha and Abigail DuBearn. (T076–T077.) Dianne Rose and Herbert Deuschel met in 2017 or 2018, and Dianne Rose hired Mr. Deuschel and his firm to do consulting and tax work for her. (T100.) Mr. Deuschel testified that, as he worked on Dianne Rose's taxes, he discussed the GP Note and how, by having a written document on which payments were made, Dianne Rose could take a "bad debt" tax loss. (T107.)

9

Dianne Rose also mentioned to Mr. Deuschel that her son, Paul, was looking for investors. Mr. Deuschel relayed that message to his clients, Greg Eversole and Sacha and Abigail DuBearn. (A0558.) Greg Eversole worked for the DuBearns' Florida-based hemp cultivation company. (T132.) Mr. Eversole and the DuBearns reviewed the Stone Wolf business plan and visited the Stone Wolf property in Vermont. (*See* T135–T136.) They hired a law firm to assist in their "due diligence" process. (Doc. 2-73 at 10.) Mr. Eversole testified that they felt comfortable investing in Stone Wolf based on their understanding that Paul had already invested more than $1 million and that he owned the company "free and clear." (T143.) On or about April 10, 2019, Mr. Eversole's company and Abigail and Sacha DuBearn (the "Florida Investors") invested approximately $1 million in Stone Wolf. (*See* Doc. 2-73 at 221–275 (stock purchase agreement).) Paul Rose never disclosed the PB Note to the Florida Investors.

The relationship between Paul Rose and the Florida Investors soon deteriorated. The Stone Wolf principals decided that the best course of action would be to file an assignment for the benefit of creditors for both Stone Wolf and Pekin Brook. Paul Rose and the Florida Investors executed General Assignments dated November 20, 2019. (*See* Doc. 2-73 at 167–176.) A schedule of financial obligations attached to the General Assignment did not list the Rose Trust as a creditor of Stone Wolf or Pekin Brook. (*Id.* at 175.)

Paul Rose passed away in December 2019. The Rose Trust asserted a right to payment after Paul's death. The debtors filed for bankruptcy in June 2020 through the assignee. (Doc. 2-9.) The assignee caused Stone Wolf and Pekin Brook to file for Chapter 7 bankruptcy in June 2020. (*See* Doc. 2-9.) The Rose Trust filed proofs of claim in both bankruptcy cases in September 2020 claiming to be a creditor based on the PB Note. (Doc. 2-20 at 26–33.) The Chapter 7 Trustee objected to those claims (A0116) and the Bankruptcy Court's decision

10

followed after the three days of evidentiary hearings in late 2022. *In re Pekin Brook Farm LLC*, Nos. 20-10207, 20-10208, 2022 WL 17824221 (Bankr. D. Vt. Dec. 20, 2022).

### The Bankruptcy Court's Decision

The decision of the Bankruptcy Court recognized the stipulation of the parties that the Rose Trust made the payments described in the disbursement schedule and that the claims were "prima facie valid." The court recognized that Delaware law governed the validity of these claims. Applying Delaware decisional law concerning the requirement of consideration in the formation of an enforceable contract, the court concluded that there was neither written evidence of a transfer of debts owed by Paul, Virginia, or GPLM to Pekin Brook nor a showing of the payment of new consideration to support the PB Note. (A0010.) The court held that "[c]onsideration for the Pekin Note cannot be built upon a commitment to honor a pre-existing obligation as it is deemed neither benefit nor detriment." (A0011 (citations omitted).) Because the PB note was unenforceable for lack of consideration, the court disallowed the claim against Pekin Brook in its entirety.

The Bankruptcy Court also disallowed the claim against Stone Wolf due to a lack of evidence that would render Stone Wolf liable for the debt of its subsidiary. (A0012.) The Rose Trust did not appeal this aspect of the decision.

### Analysis

The Rose Trust requests that the district court reverse the Order "only in part, as to the Rose Trust's claim against Pekin Brook." (Doc. 3 at 8.) The Rose Trust argues that the Bankruptcy Court erred because: (1) it should have found the PB Note to be an enforceable promissory note under the UCC; (2) it failed to construe the PB Note as a whole; (3) it failed to recognize that the PB Note itself is the writing needed to evidence Pekin Brook's assumption of

11

the obligation to repay the disbursals;[10] (4) the PB Note is enforceable as to the $150,000 disbursed directly to Pekin Brook because the UCC specifically allows pre-existing obligations to serve as consideration for negotiable instruments; and (5) even if disbursals to Pekin Brook were "past consideration," the PB Note is still a valid contract supported by consideration under Delaware contract law. (*See* Doc. 3.)

I.  **UCC Analysis**

Article 3 of the UCC governs the enforcement of promissory notes and other negotiable instruments. Two provisions of Article 3 govern this case. Delaware has adopted both.

Section 3-104 of Title 6 of the Delaware Code defines the requirements for negotiable instruments, including promissory notes. As relevant here, these include an unconditional promise to pay a fixed amount of money on demand or at a particular time and without further conditions beyond repayment. The PB Note meets these statutory requirements and qualifies as a negotiable instrument subject to the other provisions of Article 3.

Section 3-303 of Title 6 of the Delaware Code governs the requirement of consideration. It provides in full:

> (a) An instrument is issued or transferred for value if:
>
> (1) The instrument is issued or transferred for a promise of performance, to the extent the promise has been performed;
>
> (2) The transferee acquires a security interest or other lien in the instrument other than a lien obtained by judicial proceeding;
>
> (3) The instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due;

---

[10] It therefore appears that the Rose Trust necessarily disputes the Bankruptcy Court's determination that the Rose Trust "produced no writing demonstrating the assumption and/or transfer of debt obligations" between Paul, Virginia, GPLM, and Pekin Brook Farm, LLC. (A0010.)

12

(4) The instrument is issued or transferred in exchange for a negotiable instrument;

(5) The instrument is issued or transferred in exchange for the incurring of an irrevocable obligation to a third party by the person taking the instrument.

(b) "Consideration" means any consideration sufficient to support a simple contract. The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed. If an instrument is issued for value as stated in subsection (a), the instrument is also issued for consideration.

Two provisions are relevant here.[11] The first is § 303(a)(3) that defines "value" to include "payment of, or as security for, an antecedent claim against any person, whether or not the claim is due." The second is the final sentence in § 303(b) stating that "value" and "consideration" have the same meaning for determining whether an instrument is issued for consideration. Section 303(b) incorporates the definition of value in § 3-303(a) into the definition of consideration.[12]

In defining "value," Section 3-303(a)(3) specifically includes issuance of a negotiable instrument in payment or as security for an antecedent claim against any person. That is exactly what has occurred in this case. The Rose Trust held an antecedent claim against Paul, Virginia,

---

[11] Not relevant here is whether the PB Note was "transferred" for value. That was an issue in *American Federal Savings & Loan Ass'n v. Madison Valley Properties Inc.*, 1998 MT 93, 288 Mont. 365, 958 P.2d 57. But the PB Note did not need to be transferred to the Rose Trust because the note already identified the Rose Trust as the "holder." (A0217.) No transfer was required to make the Rose Trust entitled to enforce the PB Note. *See* 6 Del. C. § 3-301 ("'Person entitled to enforce' an instrument means (i) the holder of the instrument . . . .").

[12] The two terms play different roles in Article 3. "Consideration is relevant in determining whether the obligation of a party can be enforced against him or her. An obligor who has not received consideration has a defense to his or her obligation to pay the instrument. Value, on the other hand, refers to what the holder or transferee gives for the instrument." 6B Anderson U.C.C. § 303:4 (3d ed. 2022). We are concerned here only with consideration as a potential defense to enforcement of the note.

13

GPLM and Pekin Brook for the payments it made to them. Whether the members of the Rose family understood that Paul meant to repay his mother from his own funds or through income received by GPLM or, later, Pekin Brook is a matter of dispute. Testimony from Dianne was not always precise about the distinction between her son as an individual and the corporations which owned and operated the farm. See Trustee's Memorandum at 12. What is not in dispute is that the Rose Trust obtained promissory notes, first from GPLM and later from Pekin Brook, promising repayment. Consideration for the PB Note was present because the Rose Trust had previously made payments to various parties and held an antecedent claim for repayment of these advances. Much of the claim was documented by the GPLM Note in the amount of $602,500. The balance was for money advanced directly to Pekin Brook itself. The maker of the note—Pekin Brook—issued the note to document its obligation to repay the trust for the payments previously made to itself and to third parties.

> The official comment to § 3-303 provides a relevant example:
>
> Case #1. X owes Y $1,000. The debt is not represented by a note. Later X issues a note to Y for the debt. Under subsection (a)(3) X's note is issued for value. Under subsection (b) the note is also issued for consideration whether or not, under contract law, Y is deemed to have given consideration for the note.

6 Del. C. § 3-303 cmt. 1. The Chapter 7 Trustee might object that the present case is different because the antecedent debt was (mostly) owed, not by Pekin Brook, but by Paul, Virginia, and GPLM. The official comment addresses that issue as well. "Subsection (a)(3) applies to any claim against any person; there is no requirement that the claim arise out of contract. In particular the provision is intended to apply to an instrument given in payment of or as security for the debt of a third person, even though no concession is made in return." 6 Del. C. § 3-303 cmt. 4.

14

Case law applying the UCC as adopted in various states reaches the same conclusion. See *In re Bedrock Mktg.*, 404 B.R. 919, 941 (2009)("The Defendant is correct in his assertion that as a general rule and in the absence of a statute validating past consideration, past consideration is insufficient to support a promise. However, there is such a statute validating past consideration for negotiable instruments in Utah. [Citing Utah's version of UCC § 3-303]"; *St. Paul Fire & Marine Ins. Co. v. State Bank of Salem*, 412 N.E. 2d 102 (Minn. Ct. of App. 1980)("[Section 3-303(b) plainly states that value is given for an instrument when the instrument is taken in payment for an antecedent debt not yet due.");

As this discussion is intended to illustrate, the requirement of consideration in Article 3 of the UCC is more specific than the general requirement in contract law that consideration rests upon a benefit to the promisor or some detriment to the promisee. If the promissory note meets the definition of a negotiable instrument—as the note in this case does—it is sufficient to demonstrate consideration through the reference to an antecedent debt owed to the holder of the note. The antecedent debt does not have to be owed by the maker. It does not have to be discharged when the maker signs the note. Consideration is present because the Rose Trust held an antecedent claim for its prior advances for which it obtained additional security through the PB Note. Nothing more is required to establish consideration.[13]

The court reverses the decision of the Bankruptcy Court because it did not apply the Delaware version of the Uniform Commercial Code to the Trustee's assertion that the PB Note was unenforceable for lack of consideration.

---

[13] It also does not matter that Dianne Rose and Paul Rose could be described as "immediate parties" under former 5A Del. C. § 3-306(c). That statute has been repealed as unnecessary. *See* 6 Del. C. § 3-305 cmt. ¶ 2.

## II. Disposition

The Rose Trust requests that the district court allow the Rose Trust's claim against Pekin Brook. (Doc. 3 at 44.) On appeal, the Chapter 7 Trustee does not articulate any basis to disallow the Rose Trust's claim against Pekin Brook other than the lack of consideration discussed above. The court reverses the decision of the Bankruptcy Court and remands the case for further consideration of the allowance of the claim.

The Chapter 7 Trustee argues that the district court can affirm the Bankruptcy Court on alternative grounds "by recharacterizing the claims filed by the Rose Trust as equity." (Doc. 5 at 33.) Such recharacterization cannot be a basis for *disallowing* the Rose Trust's claim. *See In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 1295928, at *12 (Bankr. S.D.N.Y. Apr. 29, 2022) ("Application of the doctrine of recharacterization does not provide a basis for disallowing a claim; it is a separate and distinct inquiry from disallowance under section 502(b)(1)."). But recharacterization would favor the Florida Investors who advanced money to Stone Wolf because its effect "is subordination of the claim as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." *Id.* (quoting *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749 (6th Cir. 2001)).

Noting that the Chapter 7 Trustee did not request recharacterization as to Pekin Brook Farm, LLC in the Bankruptcy Court proceedings, the Rose Trust contends that the recharacterization argument fails for five reasons:

> 1) it is procedurally improper as it is raised for the first time in the Opposition; 2) it is not presented on cross-appeal; 3) it is not supported by law or findings in the Order—which did not reach recharacterization; 4) recharacterization of the Rose Trust's Pekin Brook claim is not an argument the Bankruptcy Court *could have* addressed or considered because it was not raised prior to its present inclusion in the Opposition; and, 5) the Bankruptcy Court did not invoke its 11 U.S.C. § 105 authority in the Order.

(Doc. 7 at 5.) Those may all be good reasons for the Bankruptcy Court to decline to recharacterize the PB Note. The district court expresses no view on this issue. The district court remands the case so that these issues may be fully developed and decided by the Bankruptcy Court in the first instance.

## Conclusion

The Rose Trust does not seek reversal or any other action or remedy as to debtor Stone Wolf Capital Management Company in the appeal docketed No. 2:23-cv-4. (*See* Doc. 3 at 8.) That appeal is accordingly DISMISSED as MOOT.

In the appeal as to debtor Pekin Brook Farm, LLC, No. 2:23-cv-5, the Bankruptcy Court's Order as to the Rose Trust's claim against Pekin Brook Farm, LLC is REVERSED and the matter is REMANDED for further proceedings consistent with this decision.

Dated at Rutland, in the District of Vermont, this 17 day of August, 2023.

_____
Geoffrey W. Crawford, Chief Judge
United States District Court